IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

WILLIAM SNIDER                                                             PLAINTIFF

v.                NO. 4:21-cv-00719 PSH

KILOLO KIJAKAZI, Acting Commissioner              DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff William Snider ("Snider") challenges the denial of his applications for disability insurance benefits and supplemental security income payments. It is Snider's primary contention that his residual functional capacity was erroneously assessed by the Administrative Law Judge ("ALJ"). Specifically, Snider maintains that the assessment does not fully capture the limitations caused by his pain. Because substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error, his decision is affirmed.[1]

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

The record reflects that Snider was born on May 5, 1986, and was thirty years old on August 1, 2016, the alleged onset date. He alleged that he is disabled as a result of the pain in his neck and upper extremities.

Snider has complained of neck and shoulder pain since at least 2014, when he appears to have been involved in an oil field accident. See Transcript at 341, 344. On February 11, 2014, Snider presented to Dr. D'Orsay Bryant, M.D., ("Bryant") complaining of severe neck and shoulder pain. See Transcript at 587. The pain radiated from Snider's neck into the posterior shoulder, down his arm, and into his hand. He was taking Mobic for the pain. X-rays revealed some degenerative changes in his lower cervical spine. Bryant referred Snider to Dr. Ippei Takagi, M.D., ("Takagi") for a neurosurgical consultation.

Snider saw Takagi on March 11, 2014. See Transcript at 744-747. The consultation notes reflect that Snider described the pain in his neck and right arm as an achy, burning, shooting pain. Although "[a] [r]educed sensation of the C6 and 7 distributions on the right [was] noted with touch," see Transcript at 746, he had a full range of motion in his cervical and lumbar spines. He also had full, 5/5 function in his shoulders, elbows, wrists, hands, and fingers. Takagi offered the following assessment of Snider's condition and a proposed treatment plan:

> [Snider has had] symptoms since January. He has right arm pain into the thumb, index and middle fingers. He does not have much left arm pain. MRI shows left C45, left C56 and right C67 foraminal narrowing. ... He has right C67 radiculopathy. I've offered [epidural steroid injections/physical therapy]. If he fails, he is a surgical candidate for [a] C67 [anterior cervical discectomy and fusion]. ...

See Transcript at 747. Takagi opined that Snider could return to "regular work" on April 24, 2014. See Transcript at 749.

The medical record is silent for the better part of the next five years until April 23, 2019, when Snider saw Dr. Patrick Antoon, M.D., ("Antoon") for complaints of persistent neck pain. See Transcript at 341-343. Snider reported that the pain was severe, constant, and dull. It was posterior and radiated into his scalp, upper back, and intrascapular area. Associated symptoms included crepitus, headaches, neck stiffness, and upper extremity paresthesia. He was found to have a "normal gait; normal range of motion of all major muscle groups; no limb or joint pain with range of motion; muscle strength: 5/5 in all major muscle groups; normal overall tone spine; no scoliosis or other abnormal spinal curvatures." See Transcript at 342. Antoon assessed neck pain and cervical radiculitis. Antoon prescribed gabapentin and recommended, inter alia, that Snider begin range-of-motion exercises for his neck.

Snider thereafter saw Antoon on multiple occasions for continued complaints of neck pain. See Transcript at 344-347, 368-371, 372-374, 375-378, 543-546, 547-550, 604-607, 608-611, 758-761. The progress notes reflect that Snider reported pain radiating from his neck, into his shoulders and back, and into his upper extremities. The pain caused a limited range of motion in his neck and back and restricted his ability to reach overhead. At a June 27, 2019, presentation, his muscle strength was 4/5 in his right arm, and he had reduced grip strength in his right hand. At the other presentations, though, his muscle strength was 5/5 in all muscle groups. Antoon's diagnoses included cervical disc disorder at C5-C6 and C6-C7 with radiculopathy. Antoon continued to prescribe pain medication that included gabapentin, and Snider reported some benefit from the medication. See Transcript at 368, 375. Antoon ordered testing and referred Snider to Dr. Blake Phillips, M.D., ("Phillips"), a neurosurgeon.

Snider underwent medical testing during the period he saw Antoon. The impressions of a July 1, 2019, radiology report were as follows: "[m]oderate to severe left subarticular recess stenosis at C4-C5," "[m]oderate right neural foraminal stenosis at C6-C7," and "[m]oderate left neural foraminal stenosis at C7-T1." See Transcript at 349. The impressions of a January 17, 2020, cervical spine MRI were as follows:

> C6-7 spondylosis with disc bulge results in mild to moderate canal stenosis, moderate to severe RIGHT and moderate LEFT foraminal stenosis.
>
> C7-T1 LEFT herniated disc extension results in severe LEFT foraminal stenosis.
>
> C5-6 LEFT osteophyte/disc complex results in moderate to severe LEFT lateral recess and foraminal stenosis.
>
> C4-5 LEFT osteophyte/disc complex results in moderate LEFT lateral recess and foraminal stenosis.

See Transcript at 436.

Snider saw Phillips on August 27, 2019, for neck pain and bilateral arm pain. See Transcript at 362-366. Snider reported that the pain was greater in his right arm than his left arm, and the pain was "located in his shoulder blades into his bicep, forearm and right fingers." See Transcript at 362. The progress note from that presentation also reflects the following:

> This is a chronic problem. Episode onset: 5 years. The problem occurs constantly. The pain is present in the generalized neck. The quality of the pain is described as shooting, aching and burning. The pain radiates to the left shoulder, right shoulder, right arm and left arm (R>L). The pain is moderate. The symptoms are aggravated by position (driving, laying down). Associated symptoms include numbness, headaches and weakness. ...

See Transcript at 362. Snider had normal strength and tone and 5/5 strength in his bilateral arms. Phillips diagnosed cervical spondylosis with radiculopathy and made the following findings:

> ... MRI of the cervical spine does reveal multilevel cervical spondylosis especially given his age worse at 5 6 and 6 7. He has neuroforaminal stenosis worse on the right side at C6-7 and left side at C5-6. AP lateral and flexion extension x-rays today. I am going to start him in physical therapy for the cervical spine have him return to the tail end. Without much improvement in his neck or arm symptoms he may require surgical intervention.

See Transcript at 365.

At Antoon's recommendation, Snider began a period of physical therapy. See Transcript at 392-395. At what appears to have been the fifth session, a physical therapy assistant made the following notation:

> pt reports that he is having severe pain this afternoon in his B neck and into his head causing headache. pt states that he thinks that ICTx is making pain worse and requests to stop cervical traction. pt laid supine with MHP under cervical region x20 minutes to try and relieve some pain. pt tolerated MHP well but reports post MHP that he still has headache. pt attempted to perform cervical exs but reports that he is still too stiff and pain is too great. pt states that he is to return to his doctor next week to discuss surgery date and pt reports that he will ask doctor if he needs to cont with PT since he is getting worse.

See Transcript at 395.

Snider continued to see Phillips, or an Advanced Practice Registered Nurse in his office, for complaints of pain. See Transcript at 421-424, 429-434, 452-456, 457-461. The progress notes reflect that the pain continued to radiate from Snider's neck into his shoulders, arms, and hands. He had a decreased range of motion in the cervical part of his back but otherwise had full strength in all of his muscle groups. Because he had "failed to improve w/NSAIDs, gabapentin, steroids, and physical therapy," see Transcript at 430, he asked to proceed with an anterior cervical discectomy and fusion ("ACDF").

On February 10, 2020, Snider underwent a C6-7, C7-T1 ACDF. See Transcript at 463. At a follow-up presentation, he continued to report neck pain but reported some improvement in his "arm symptoms." See Transcript at 541. He reported a pain level of seven on a ten point pain scale and was prescribed Norco for his pain.

Snider also sought treatment for his pain from other medical providers. For instance, on July 25, 2020, he sought medical attention at the Magnolia Regional Medical Center for pain radiating from his neck down through his fingers. See Transcript at 650-666. The pain appears to have been caused, in part, by his wife "hanging off [his] neck" during an argument. See Transcript at 650. He had full strength in his extremities, a

7

full range of motion, and a steady gait. A CT scan of his cervical spine was taken, and the results were interpreted as follows: "Post surgical fusion at C6-7 and C7-T1 levels. Asymmetric degenerative changes to the left at C5-6 and C4-5 levels which may contribute to patient's radiculopathy and correlation recommended." See Transcript at 660. He left the presentation in "good cond[ition]." See Transcript at 655.

Snider was also seen for his pain at the Arkansas Pain Care Clinics. See Transcript at 671-680, 718-725, 725-734. At an August 7, 2020, presentation, he had a limited range of motion in the cervical part of his back, and palpation at C2-3, C3-4, C4-5, and C5-6 level produced neck pain. He was prescribed medication that included gabapentin, meloxicam, Robaxin, and hydrocodone. Medial branch blocks were recommended.

On October 5, 2020, Snider underwent testing of his upper extremities and wrists at South Arkansas Orthopedics. See Transcript at 752-754, 758-761. The results of the testing were largely unremarkable. The muscles in his bilateral upper extremities were normal. As to his wrists, the results were interpreted as follows:

> The patient had median nerve demyelination, involving the motor and sensory fibers at the wrist level, consistent with moderate carpal tunnel syndrome bilaterally.

> He has possible cervical nerve root irritation but there was no radiculopathy noted at this time.

See Transcript at 752.

Snider's medical records were reviewed by state agency medical consultants Drs. Robert Reed, M.D., and Patrick Fields, M.D. The former opined that Snider was capable of performing work at a light level of exertion, see Transcript at 50-58, but the latter opined that Snider was capable of performing work at only a sedentary level of exertion, see Transcript at 59-67.

The record contains a summary of Dodson's work history. See Transcript at 230-241. In short, the history is largely good.

Snider completed a series of reports in connection with his applications for disability insurance benefits and supplemental security income payments. See Transcript at 264-265, 266-273. In a pain report, he represented that he requires two or more naps a day, each nap between twenty to forty minutes in length. His pain is constant and is exacerbated by lying down. He cannot sit, stand, or walk for any length of time. In a function report, he represented that he has difficulty attending to his own personal care but can prepare simple meals and perform simple household chores.

Snider testified during the administrative hearing. See Transcript at 36-43. Although he has a driver's license, he does not drive because he has difficulty sitting for more than thirty-five to forty minutes at a time. He attempted to work in 2018 and again in 2019, but he was forced to stop work because of his pain. When asked to describe his pain, he testified as follows: "It starts at the base of my neck and goes out through my shoulders and down to my pinky and ring finger on both hands." See Transcript at 40. He has difficulty performing any activity that requires the use of his hands or requires him to lean over. A typical day consists of "[w]alking around or laying down trying to catch up on rest." See Transcript at 42.

The ALJ found at step two of the sequential evaluation process that Snider has severe impairments in the form of "degenerative disc disease, cervical spine and bilateral carpal tunnel syndrome." See Transcript at 15. The ALJ assessed Snider's residual functional capacity and found that Snider is capable of sedentary work, "except he could perform no more than occasional grasping, fingering, or feeling with either upper extremity." See Transcript at 18. The ALJ found at step four that Snider is unable to perform his past relevant work. At step five, the ALJ relied upon the testimony of a vocational expert and found that there is other work Snider could perform.

Snider maintains that his residual functional capacity was erroneously assessed. He so maintains because the assessment does not fully capture the limitations caused by his pain. In support of his contention, he notes that no consideration was given to his failure to "regain the strength in his arms and hands following the [ACDF]" or to his "problems at C4-5 and C5-6." See Docket Entry 12 at CM/ECF 6, 12.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The ALJ does so by considering all the evidence in the record. See Grindley v. Kijakazi, 9 F.4th 622 (8th Cir. 2021).[2]

---

[2] With respect to the claimant's subjective complaints, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluate the intensity, persistence, and limiting effects of the pain or other symptoms. In evaluating the intensity, persistence, and limiting effects of the pain or other symptoms, the ALJ must consider all the evidence in the record, including evidence of the following factors:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms ...; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p. See also 20 C.F.R 404.1529; Polaski v. Heckler, 751 F.3d 943 (8th Cir. 1984).

Having reviewed the record, the Court finds that the ALJ did not err in assessing Snider's residual functional capacity. The ALJ adequately evaluated all of the evidence relevant to Snider's pain and accounted for the limitations it causes. The Court so finds for the following reasons.

The evidence relevant to the limitations caused by Snider's pain is inconsistent and is capable of more than one acceptable characterization, one of which was made by the ALJ. It is true that Snider complained of neck pain that radiated into his shoulders, upper extremities, wrists, and hands. He also occasionally had reduced grip strength in his right hand. The medical testing revealed degenerative changes in the cervical part of his spine, and he underwent a C6-7, C7-T1 ACDF on February 10, 2020.

It is also true, though, that Snider typically had normal strength and tone in his muscle groups, including in his bilateral arms. Testing of his upper extremities and wrists performed on October 5, 2020, was largely unremarkable. The muscles in his bilateral upper extremities were normal, and he had what was characterized as "moderate carpal tunnel syndrome bilaterally." See Transcript at 752. Following the ACDF, the treatment for his pain was routine and conservative. He was treated with medication that included gabapentin, meloxicam, and hydrocodone, although medial branch blocks were recommended at one point.

The ALJ adequately evaluated Snider's subjective complaints, which is a key evaluation in any case involving an allegation of disabling pain. For instance, the ALJ considered Snider's daily activities and the factors that precipitate and aggravate his pain. As to those factors, the ALJ could and did find as follows, a finding the Court adopts:

> ... While the claimant has described himself as having limited use of his upper extremities, he has also described himself as able to engage in a relatively normal level of functioning. He has reported doing things like shopping for groceries or other necessities, preparing meals, and driving. He has even noted that he is able to wash dishes, fold clothes, and vacuum, sweep, or mop the floor by using his left arm. ... As for his suggestion that he could not sit for more than forty-five minutes at a time and would need to lie down for two hours, it is difficult to attribute that degree of limitation to the claimant's medical conditions or established impairments in view of the relatively benign medical evidence. Rather, his limited mobility and lifting limitations are found adequately accounted for by a limitation to sedentary exertion.

See Transcript at 18-19. The ALJ considered factors such as the dosage, effectiveness, and side effects of Snider's medication, noting in part that the medication causes some blurred vision and dizziness. The ALJ also considered treatment, other than medication, that Snider has received for his pain, noting that he received physical therapy for a period of time with inconsistent results.

Snider faults the ALJ's analysis because no consideration was given to Snider's failure to "regain the strength in his arms and hands following the [ACDF]." See Docket Entry 12 at CM/ECF 6. The Court cannot agree for two reasons. First, the ALJ considered the matter.[3] Second, the evidence relevant to the strength in his arms and hands following the February 10, 2020, ACDF is inconsistent. Although he continued to report pain in his arms and hands following the procedure, the findings and observations of the medical professionals were unremarkable. As the ALJ noted, "records from both Dr. Antoon and Dr. Phillips reflect relatively normal objective findings throughout 2020." See Transcript at 20. When Snider was seen at the Magnolia Regional Medical Center on July 25, 2020, he had full strength in his extremities and a full range of motion. Moreover, the October 5, 2020, testing of his upper extremities and wrists was largely unremarkable. The muscles in his bilateral upper extremities were normal, and he had "median nerve demyelination" "consistent with moderate carpal tunnel syndrome bilaterally." See Transcript at 752.

---

[3] As to Snider's arm strength following the ACDF, the ALJ found the following: "Although the claimant has reported ongoing issues with neck and arm pain since Dr. Phillips' surgery, he has described his strength and sensation as improved, and records from both Dr. Antoon and Dr. Phillips reflect relatively normal objective findings throughout 2020." See Transcript at 20. With respect to Snider's wrist strength, the ALJ found the following: "Dr. Arshad has also recorded observations of hand weakness and, although his assessment of the claimant's strength was normal, diagnostic findings from October 2020 have shown moderate bilateral carpal tunnel." See Transcript at 20.

Snider faults the ALJ's analysis because no consideration was given to Snider's "problems at C4-5 and C5-6." See Docket Entry 12 at CM/ECF 12. Although the ALJ's consideration of Snider's problems at C4-5 and C5-6 was minimal, it does not warrant remanding this case. Undoubtedly, Snider has pain and a limited range of motion in the cervical part of his back. The treatment he received for the impairment, though, was typically routine and conservative, and the limitations caused by the impairment do not severely restrict, inter alia, his activities of daily living. Moreover, the ALJ appears to have adequately accounted for the limitations by restricting Snider to sedentary work.

Snider also maintains that the ALJ did not adequately develop the record. Specifically, Snider maintains that he should have been sent for a consultative examination or, at a minimum, the ALJ should have contacted Dr. Muhammad Arshad, M.D., a physician at the Arkansas Pain Care Clinics.

The ALJ has a duty to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

Here, there is sufficient information for the ALJ to have made an informed decision. The ALJ could and did rely upon the findings and observations of Snider's treating physicians, the medical testing, and his subjective complaints in assessing his residual functional capacity.

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). In fact, the Court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. See Id. Here, the evidence is capable of more than one acceptable characterization, and the ALJ could find as he did with respect to Snider's residual functional capacity.[4]

---

[4] Snider additionally maintains no consideration was given to his lack of funds. See Docket Entry 12 at CM/ECF 10. The Court cannot agree. The ALJ specifically noted that "... the claimant has testified his providers have not discussed additional surgical intervention and, while they have recommended steroid injections for pain, he has been unable to follow though due to an outstanding invoice." See Transcript at 19.

Snider appears to maintain that he is alternatively entitled to a closed period of disability benefits. His perfunctory assertion is without merit.

Snider also appears to challenge the manner in which the ALJ conducted the administrative hearing, noting that the ALJ "conducted the entire hearing and then went straight to the vocational testimony without allowing [Snider's] attorney to question [Snider]." See Docket Entry 12 at CM/ECF 5. This assertion warrants no relief as Snider's attorney failed to interpose an objection to the manner in which the hearing was conducted and did not ask to question his client.

In conclusion, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Snider's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 11th day of April, 2022.

_____
UNITED STATES MAGISTRATE JUDGE